## UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI

PLANNED PARENTHOOD OF KANSAS )
AND MID-MISSOURI, INC., )
           )
       Plaintiff, )
           )
     v. )  Civil No. 2:15-cv-04273-NKL
           )
PETER LYSKOWSKI, )
           )
       Defendant. )

## ORDER

Pending before the Court is Plaintiff Planned Parenthood of Kansas and Mid-Missouri, Inc.'s ("PPKM") motion for permanent injunction. For the following reasons, the motion is granted.

## I.    Summary of the Case

The issue before the Court is whether the Missouri Department of Health and Senior Services ("DHSS") violated the Due Process Clause or the Equal Protection Clause of the Fourteenth Amendment of the U.S. Constitution when it sought to revoke PPKM's ambulatory surgical center ("ASC") license.[1]

The Equal Protection Clause prohibits the government from irrationally discriminating between similarly situated entities. Having reviewed the evidentiary record, the Court finds that DHSS treated PPKM more harshly than other similarly situated institutions and thereby violated the Equal Protection Clause.

---

[1] PPKM has not argued that Missouri laws governing PPKM's license are facially invalid.

1

The evidence shows that revocation of an ASC license is an extremely rare event. DHSS does not dispute that prior to attempting to revoke PPKM's license, it has only revoked one ASC license. That revocation occurred after a DHSS inspection of the Surgical Center of Creve Coeur revealed a host of immediate public health and safety threats at the facility. Included among the facility's deficiencies were its failure to maintain complete patient medical records, failure to follow procedures relating to proper drug maintenance and disposal, and allowing nursing staff to provide conscious sedation to patients without training. The facility was also without a doctor for a period of time. Despite the egregious safety violations accompanying the facility's lack of a qualified physician, DHSS worked with the facility to try to cure the deficiencies for approximately two years before revoking its ASC license.

In stark contrast, once DHSS became aware in September 2015 that PPKM would be without a doctor with hospital privileges beginning December 1, 2015, it immediately sent PPKM a letter informing the center that its ASC license would be revoked on December 1. DHSS has recognized multiple times that PPKM's deficiency created no immediate health or safety concerns. Both PPKM and DHSS have acknowledged that without a doctor with hospital privileges, PPKM will perform no abortions. Despite the fact that PPKM's deficiency created no health or safety exigency, DHSS solicited no plan of correction from PPKM in accordance with statutory procedures and refused to allow PPKM to have any actual period of deficiency prior to revoking the facility's license. The evidence submitted to the Court indicates that DHSS's unprecedented hasty actions were likely the result of political pressure being exerted by Missouri legislators and the

2

Department's perception that if it did not act in accordance with the legislature's desires, its budget would be cut.

DHSS's disparate treatment of PPKM cannot be justified by political pressure or public opposition to PPKM. "[I]f the constitutional conception of 'equal protection of the laws' means anything, it must at the very least mean that a bare [legislative] desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *U.S. Dept. of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973). Therefore, PPKM is entitled to a permanent injunction.

## II.    Background

Missouri law requires that all abortion facilities be licensed as ASCs. Mo. Rev. Stat. § 197.200. The ASC licenses are issued and managed by DHSS. In order to be an ASC which performs abortions, the licensing regulations require that "[p]hysicians performing abortions . . . have staff privileges at a hospital within fifteen (15) minutes' travel time from the facility or the facility shall show proof there is a working arrangement between the facility and the hospital within fifteen (15) minutes' travel time from the facility granting the admittance of patients for emergency treatment whenever necessary." 19 C.S.R. § 30-30.060(1)(C)4.

In mid-July 2015, the Missouri Senate convened the Senate Interim Committee on Sanctity of Life, chaired by Senator Kurt Schaefer, to investigate Planned Parenthood's presence in Missouri. The Committee conducted an investigation into PPKM's licensing and the hospital privileges of the doctor performing abortions at PPKM's facility in Columbia, Missouri.

3

The doctor performing abortions at PPKM held privileges at the University of Missouri Heath Care under the hospital's "refer and follow" category of privileges. On August 17, 2015, Senator Schaefer sent a letter to then University Chancellor R. Bowen Loftin warning Chancellor Loftin that,

> For decades the citizens of the state of Missouri have gone to great lengths to ensure that their taxpayer dollars never enable abortion services in this state. The University of Missouri system is a publically funded entity which last year alone received approximately one half of one billion taxpayer dollars from the State of Missouri. Whether DHSS is relying on the agreement granted by the University, as a publically funded entity, to Dr. McNicholas in order to enable the abortion license issuance is a matter of substantial public interest and concern. Additionally [*sic*], such circumstance may also run afoul of Section 188.205, RSMo, which prohibits the use of public funds for the assistance or promotion of abortion procedures.

[Doc. 6-2, p. 2]. Senator Schaefer also serves on the Senate Appropriations Committee. On September 24, 2015, the University announced that effective December 1, 2015, it would eliminate the "refer and follow" category of privileges held by PPKM's physician.

The next day, on September 25, 2015, PPKM President and Chief Executive Officer Laura McQuade received a letter from DHSS Administrator John Langston informing her that the University's elimination of the "refer and follow" privileges meant that PPKM's Columbia facility would not be in compliance with state licensure mandates as of December 1, 2015. Mr. Langston warned Ms. McQuade that the facility's ASC license[2] would be revoked on December 1 if the facility did not satisfy the hospital

---

[2] Throughout the parties' briefing this license is referred to as both an "ASC license" and an "abortion facilities license." An abortion facilities license is simply the type of ASC license issued by DHSS to abortion facilities licensed as ASCs. All ASC licenses are

4

privileges requirement by December 1. [Doc. 6-1, p. 13]. On November 25, 2015, Ms. McQuade received a second letter from Mr. Langston stating that DHSS had not been notified of PPKM's ability to satisfy the physician privileges requirement and that the Department was revoking the center's license effective as of the center's close of business on November 30, 2015.

On November 30, PPKM filed a motion for Temporary Restraining Order ("TRO") and Preliminary Injunction to enjoin DHSS Director Peter Lyskowski from revoking PPKM's abortion facility license. The Court granted PPKM a TRO through December 28, 2015. Following additional briefing and oral arguments, the Court granted PPKM a preliminary injunction. In April 2016, the parties submitted trial briefs regarding the propriety of a permanent injunction. Though permitted to conduct additional discovery after the entry of the preliminary injunction, neither party has submitted any additional evidence to the Court with their briefing. Therefore, the Court evaluates the propriety of the permanent injunction based on the same record with which it considered the preliminary injunction.

## III.    Discussion

### A. Permanent Injunction Standard

The Eighth Circuit has identified four factors which must be considered in evaluating the propriety of a permanent injunction: (1) the party seeking the injunction

---

issued and managed by DHSS under the procedure set out at Mo. Rev. Stat. § 197.293. When there is any statutory distinction between an abortion ASC and other ASCs, even if the distinction is not relevant, the Court will refer to a general ASC and an abortion facility ASC, for clarity.

5

faces irreparable harm, (2) actual success on the merits, (3) the harm to the movant outweighs any possible harm to others, and (4) the injunction serves the public interest. *Community of Christ Copyright Corp. v. Devon Park Restoration Branch of Jesus Christ's Church*, 634 F.3d 1005, 1012 (8th Cir. 2011). The only difference between a motion for permanent injunction and a motion for preliminary injunction is that for a permanent injunction the movant must demonstrate actual success on the merits, rather than simply showing a propensity for success. *Bank One v. Guttau*, 190 F.3d 844, 847 (8th Cir. 1999).

As noted above, the Court previously found that PPKM was likely to succeed on the merits of its claim and was entitled to preliminary injunctive relief. For the following reasons, the Court now finds that PPKM has demonstrated actual success on the merits of its equal protection claim and satisfied the other elements of the permanent injunction standard, such that a permanent injunction is appropriate.

### B. Threat of Irreparable Injury

DHSS contends that PPKM has failed to demonstrate a threat of irreparable harm. DHSS frames the harm to be suffered in terms of the potential future relicensing costs if PPKM is able to find another physician with admitting privileges at a local hospital. DHSS then dismisses this harm because there is no guarantee that PPKM will be able to hire a new physician with hospital privileges. *See Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) ("In order to demonstrate irreparable harm, a party must show that the harm is certain and great and of such imminence that there is a clear and present need for equitable relief."). But the value of property does not evaporate merely because

6

it cannot be used presently. If a doctor were sick and unable to use a license in the foreseeable future, the revocation of his or her license would still cause certain harm even if there were no certainty about his recovery. This is because a license is a valuable property right, as evidenced by the substantial investment often associated with getting a license. The loss of that property interest is the irreparable harm that PPKM is certain to suffer if the license is taken away. *Austell v. Sprenger*, 690 F.3d 929, 935 (8th Cir. 2012). By way of example, once the license is revoked, PPKM's property interest in the license is eliminated and the process PPKM is entitled to under the Due Process Clause is significantly diminished if not eliminated. The threat of deprivation of this property and process in violation of the Fourteenth Amendment constitutes an immediate irreparable injury appropriate for redress by an injunction.

DHSS also argues that there is no irreparable harm because if PPKM's license is revoked, DHSS will reinstate the license if PPKM obtains a physician with the required privileges. However, this representation, made during oral argument on the preliminary injunction, was immediately qualified by DHSS, whose counsel said that the Department might discover some other deficiency in PPKM's qualifications which might prevent it from reinstating the license. Therefore, DHSS acknowledges that PPKM's license will not be automatically reinstated as soon as the center has a physician with the required privileges. Furthermore, based on the disparate treatment of PPKM by DHSS and the political intimidation directed at the University of Missouri Health System and DHSS, the Court does not find credible the suggestion that PPKM will have its license reinstated without incurring substantial costs and delay, and questions whether DHSS would ever

7

allow the license to be reinstated without PPKM effectively proving again all the requirements for getting a license ab initio.

Finally, even if DHSS did reinstitute the license without forcing PPKM to effectively reapply for a new license, there would undoubtedly be at least some administrative delay associated with the reinstitution of the license. Such delay would constitute a significant irreparable injury, as PPKM cannot perform abortions without a license.[3] If, however, PPKM is permitted to retain the license pending the search for a new doctor with hospital privileges, the facility will be able to immediately return to providing abortions without further delay.

The Court also concludes that PPKM's right to appeal DHSS's decision to the Administrative Hearing Commission ("AHC") does not mitigate these injuries. The AHC in its discretion "may stay or suspend any action of an administrative agency pending the commission's findings and determination in the case." Mo. Rev. Stat. § 621.035. However, the Commission is under no obligation to do so. More importantly, PPKM is not required to exhaust its administrative remedies prior to filing this action in federal court. *See Patsy v. Board of Regents of State of Fla.*, 457 U.S. 496 (1982); *c.f. Shelton v. Farr*, 996 S.W.2d 541, 542-43 (Mo. App. W.D. 1999) (addressing the adequacy of AHC review as a remedy where exhaustion of administrative remedies was required for the plaintiff to be entitled to judicial review). Imposing a requirement that

---

[3] PPKM also could not recover monetary damages for any harm it suffered because DHSS is protected by Eleventh Amendment sovereign immunity. DHSS has not waived that immunity, nor have the individual state actors waived qualified immunity or indicated that qualified immunity is inapplicable.

8

PPKM seek relief with the AHC prior to qualifying for a preliminary injunction in federal court would violate this longstanding precedent. Such a change would not just impact PPKM; it would affect all owners of business licenses, conceal and carry permits, professional licenses, etc. There is also no abstention doctrine that is applicable here. Therefore, PPKM's right to administrative review by a state agency does not justify a finding that PPKM will suffer no irreparable harm if preliminary relief is denied.

### C. Success on the Merits

PPKM has alleged that DHSS's revocation of its ASC license violates the Equal Protection Clause of the Fourteenth Amendment because other ASCs similarly situated to PPKM have been afforded the opportunity to implement a corrective plan of action for deficiencies prior to having their ASC licenses revoked.[4]

#### 1. Standard of Review

PPKM contends that DHSS's actions are subject to heightened review because DHSS is infringing upon PPKM's First Amendment association rights. As discussed below, the Court concludes that DHSS's actions cannot withstand even rational basis review. *See Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) ("Our cases have recognized successful equal protection claims brought by a 'class of one,' where the plaintiff alleges she has been intentionally treated differently from others similarly situated and there is no rational basis for the difference in treatment."). Therefore, whether PPKM is entitled to heightened scrutiny is not addressed at this time.

---

[4] PPKM also contends that DHSS has violated its procedural due process rights. As the Court concludes that a permanent injunction is appropriate based on the equal protection claim, the procedural due process claim is not addressed.

9

"To establish liability for a class-of-one violation, Plaintiff must allege that: (1) it was part of a class of individuals or groups that were similarly situated; (2) it was intentionally treated differently from its peers in a context where there were clear and defined standards governing the state's actions; (3) it suffered harm as a result of the state's actions; and (4) the difference in treatment was not rationally related to a legitimate state interest. *Village of Willowbrook,* 528 U.S. at 564 (2000); *Engquist v. Oregon Dept. of Agr.,* 553 U.S. 591, 603, 128 S.Ct. 2146, 170 L.Ed.2d 975 (2008). Essentially, a class-of-one complaint alleges that the plaintiff was treated arbitrarily worse than others who were identically situated. *Lauth v. McCollum,* 424 F.3d 631, 633 (7th Cir.2005)." *Intralot, Inc. v. McCaffrey*, 2012 WL 4361451, at *3 (N.D. Ill. Sept. 21, 2012). "A class-of-one plaintiff must . . . 'provide a specific and detailed account of the nature of the preferred treatment of the favored class,' especially when the state actors exercise broad discretion to balance a number of legitimate considerations." *Nolan v. Thompson*, 521 F.3d 983, 990 (8th Cir. 2008) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1214-15 (10th Cir. 2004)).

## 2. Whether PPKM is "Similarly Situated" to Other ASCs

In order to bring an equal protection claim as a class of one, PPKM must be able to demonstrate that it is similarly situated to other ASCs. *See Flowers v. City of Minneapolis*, 558 F.3d 794, 798 (8th Cir. 2009) ("To establish a violation of the Equal Protection Clause . . . [plaintiff] must show that he was treated differently than other persons who were 'in all respects similarly situated.'"). DHSS contends that PPKM is neither factually nor legally situated the same as other ASCs.

10

### a. Legal Similarity

Title 19, Chapter 30 of the Missouri Code of State Regulations governs ASCs. Chapter 30 recognizes three different categories of ASCs, governed by different subsections: (1) general ASCs regulated under 19 C.S.R. § 30-30.010 through § 30-30.040; (2) abortion facilities regulated under 19 C.S.R. § 30-30.050 through § 30-30.070; and (3) birthing centers regulated under 19 C.S.R. § 30-30.080 through § 30-30.110.[5] These subsections contain a few minor differences in requirements for the various types of ASCs.[6] The only distinction at all relevant to this lawsuit concerns the admitting privileges requirements. Subsection 19 C.S.R. § 30-30.060(1)(C)4 requires that,

> Physicians performing abortions at the facility shall have staff privileges at a hospital within *fifteen (15) minutes' travel time from the facility* or the facility shall show proof there is a working arrangement between the facility and a hospital within *fifteen (15) minutes' travel time from the facility* granting the admittance of patients for emergency treatment whenever necessary.

---

[5] The parties provided no information or arguments concerning the regulations governing birthing centers. Therefore, discussion of any unique regulations governing this category of ASC is absent from the Court's discussion.

[6] During oral arguments on the preliminary injunction, DHSS pointed out that 19 C.S.R. § 30-30.010(2)(H) requires a facility which ceases to operate as an ASC for a period in excess of fourteen days to surrender its ASC license to the Department. However, as DHSS recognized in its briefing, this section of Chapter 30 does not apply to PPKM because it is one of the subsections governing general ASCs, not abortion center ASCs. Abortion centers licensed as ASCs are governed by a corresponding regulation at § 30-30.050, which does not contain § 30-30.010's requirement that the facility surrender its license if it ceases to operate as an ASC. Therefore PPKM is seeking no treatment in contravention of the regulations. Moreover, as this regulatory distinction has no bearing on the due process or equal protection violations alleged by PPKM it does not prevent PPKM from being similarly situated to other ASCs for the purposes of this lawsuit.

11

*Id.* (emphasis added).  General ASCs are governed by 19 C.S.R. § 30-30.020(1)(B)4, which states:

> Surgical procedures shall be performed only by physicians . . . who are at the time privileged to perform surgical procedures in at least one (1) licensed hospital *in the community* in which the [ASC] is located, thus providing assurance to the public that patients treated in the center shall receive continuity of care should the services of a hospital be required.  As an alternative, the facility may submit a copy of a current working agreement with at least one (1) licensed hospital *in the community* in which the [ASC] is located, guaranteeing the transfer and admittance of patients for emergency treatment whenever necessary.

*Id.* (emphasis added).  Therefore, the only regulatory distinction[7] identified by the parties between the hospital privileges required for a general ASC and an abortion facility ASC is that a physician at a general ASC must have privileges at a licensed hospital "in the community," and a physician performing abortions must have staff privileges at a hospital "within fifteen (15) minutes' travel time from the facility."  As discussed below, that distinction has no bearing on the statutory process for revoking an ASC license or DHSS's historical practices when revoking an ASC license.

All three types of ASCs are governed by the same licensing statutes.  [*See* Doc. 33-4, p. 3 (Dep. of Langston under F.R.C.P. 30(b)(6), at 10:16-19)].  Two statutes are particularly relevant to the issue before the Court:

(1) Mo. Rev. Stat. § 197.220.  Denial, suspension or revocation of license:

---

[7] Mo. Rev. Stat. § 188.080 also imposes criminal penalties on physicians who violate 19 C.S.R. § 30-30.060(1)(C)4; similar penalties are not imposed on physicians who violate 19 C.S.R. § 30-30.020(1)(B)4.

[DHSS] may deny, suspend or revoke a license in any case in which the department finds that there has been a substantial failure to comply with the requirements of sections 197.200 to 197.240 . . .

(2) Mo. Rev. Stat. § 197.293. Enforcement of hospital and ambulatory surgical center licensure regulations, standards for enforcement--deficiencies in meeting standards, restricted access:

1. . . . [DHSS] shall use the following standards for enforcing hospital and [ASC] licensure regulations . . .

(1) Upon notification of a deficiency in meeting regulatory standards, the hospital or [ASC] shall develop and implement a plan of correction approved by the department which includes, but is not limited to, the specific type of corrective action to be taken and an estimated time to complete such action;

(2) If the plan as implemented does not correct the deficiency, the department may either:

(a) Direct the hospital or [ASC] to develop and implement a plan of correction pursuant to subdivision (1) of this subsection; or

(b) Require the hospital or [ASC] to implement a plan of correction developed by the department;

(3) If there is a continuing deficiency [after section 2 is implemented] . . . the department may restrict new inpatient admissions or outpatient entrants to the service or services affected by such deficiency;

(4) If there is a continuing deficiency [after section 3 is implemented] . . . the department may suspend operations in all or part of the service or services affected by such deficiency;

(5) If there is continuing deficiency [after section 4 is implemented] . . . the department may deny, suspend or revoke the hospital's or [ASC's] license pursuant to section 197.070 or section 197.220

2. Notwithstanding the provisions of subsection 1 or this section to the contrary, if a deficiency in meeting licensure standards presents an immediate and serious threat to the patients' health and safety, the department may, based on the scope and severity of the deficiency,

13

> restrict access to the service or services affected by the deficiency until the hospital or [ASC] has developed and implemented an approved plan of correction. . . .

Thus, general ASCs and abortion facility ASCs are subject to the same statute for purposes of enforcement and management of their licenses and the difference between "fifteen minutes" and "within the community" is at best a de minimus distinction that has no bearing on whether PPKM was treated rationally by DHSS. *See Robbins v. Becker*, 794 F.3d 988, 996 ("'To be similarly situated for purposes of a class-of-one equal-protection claim, the persons alleged to have been treated more favorably must be identical or directly comparable to the plaintiff in all *material respects*.'" (emphasis added)).

### b. Factual Similarity

As discussed above, DHSS is seeking to revoke PPKM's ASC license because it lacks a physician with qualifying hospital admitting privileges. DHSS Administrator John Langston stated in an affidavit that "Based on the knowledge of DHSS staff currently employed within the Bureau of Ambulatory Care, DHSS has not allowed a general ambulatory surgical center with a single physician who lost the hospital privileges required by law, and lacked a working agreement guaranteeing emergency transfers, to keep its license." [Doc. 36-2, p. 2]. However, the record indicates that SCCC lost its only physician in 2012 and its license was not summarily revoked.[8] [Doc.

---

[8] Defendant disputes the Court's conclusion in the preliminary injunction order that SCCC lost its only physician in 2011. Regardless of whether SCCC's sole physician continued to practice after being diagnosed with Parkinson's Disease in February 2011, the record unequivocally shows that as of at least July 2012 DHSS Administrator John

Case 2:15-cv-04273-NKL   Document 75   Filed 05/11/16   Page 14 of 28

40-1, p. 4 (email from Langston to Linneman (July 31, 2012), Bates 006712)]. The record also indicates that a somewhat similar situation arose in 2013 involving PPKM and the facility's ASC license was not immediately revoked.

In fact, the record indicates that DHSS has in only two instances sought to revoke ASC licenses: in this case, and in the case of the Surgical Center of Creve Coeur. As discussed below at Part II(C)(3)(b), the situation at SCCC presented significant threats to patient health and safety. The Seventh Circuit has recognized on multiple occasions that a plaintiff may demonstrate that it has suffered intentional, irrational, and arbitrary discrimination "either by showing that he was treated differently from identically situated persons for no rational reason, or that he was treated worse than less deserving individuals for no rational reason." *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004); *see also Esmail v. Macrane*, 53 F.3d 176, 179 (7th Cir. 1995) (". . . equal protection does not just mean treating identically situated persons identically. If a bad person is treated better than a good person, this is just as much an example of unequal treatment."). PPKM's allegations fall into this second category, contending that the discrimination against the center is evident because unlike the situation at SCCC where patient health and safety were at risk, there are no similar risks present here. Though the Eighth Circuit has not addressed this issue, the logic of the Seventh Circuit is persuasive. Common

---

Langston had been informed that Dr. Eggleston would no longer be performing surgery at SCCC and was in the process of being removed from the business operations of the center. [Doc. 40-1, p. 4 (email from Langston to Linneman (July 31, 2012), Bates 006712)]. Despite this knowledge, Langston continued to propose solutions such as temporarily suspending SCCC's license for a few months while the center corrected its deficiencies. *Id.* Revocation was not discussed in these communications.

Case 2:15-cv-04273-NKL   Document 75   Filed 05/11/16   Page 15 of 28

sense dictates that a plaintiff who is treated worse than an actor exhibiting significantly worse behavior should be able to maintain a cause of action under the Equal Protection Clause.

### 3. How PPKM was Treated Differently

#### a. General Process for Compliance Deficiencies

If an ASC is found not to be in substantial compliance with licensing requirements as required by Mo. Rev. Stat. § 197.220, DHSS generally follows the procedure set out at Mo. Rev. Stat. § 197.293.[9]  [Doc. 15-1, p. 3 (Letter from Emily Dodge, Assistant Attorney Gen., to Plaintiff's Counsel (Dec. 1, 2015)); Doc. 33-4, p. 4 (Dep. of Langston under F.R.C.P. 30(b)(6), at 11:20-25)].  This statute contemplates that when DHSS identifies deficiencies in an ASC the ASC will be given an opportunity to submit a plan of correction and time to implement this plan.  *See* Mo. Rev. Stat. § 197.293.  In some instances, there may be multiple plans of correction developed and implemented by the ASC.  [Doc. 33-1, p. 9 (Dep. of Koebel under F.R.C.P. 30(b)(6), at 39:11-13)].  If the initial plan of correction is not successful in correcting the deficiency, the statute sets out steps DHSS may take, increasing in severity as corrective action fails to solve the deficiency.  The statute also provides, however, that where a deficiency "presents an immediate and serious threat to the patients' health and safety," DHSS is permitted to bypass this incremental process and "restrict access to the service or services affected by the deficiency until the hospital or ambulatory surgical center has developed and implemented an approved plan of correction."  Mo. Rev. Stat. § 197.293(2).  Other than

---

[9] The text of this statute is set out above at Part II(C)(2)(a).

the PPKM revocation that is the subject of this litigation, there is no instance in DHSS records involving an ASC license revocation without a plan of correction being put in place first. [Doc. 33-4, p. 20 (Dep. of Langston under F.R.C.P. 30(b)(6), at 41:18-23)].

When evaluating a proposed plan of correction, DHSS has discretion as to how much time to give a license-holder to correct a deficiency, within an outer timeframe of when the license expires. [Doc. 33-4, p. 8 (Dep. of Langston under F.R.C.P. 30(b)(6), at 22:17-20)]. However, the Department may permit the plans of correction to extend over some indefinite period of time during which time DHSS could suspend the ASC's license. [Doc. 33-1, p. 9 (Dep. of Koebel under F.R.C.P. 30(b)(6), at 39:11-20)]. Generally, all decisions about plans of correction and ASC license actions are made by DHSS at the "bureau-level," by the DHSS employees who conduct ASC surveys. [Doc. 33-4, p. 13 (Dep. of Langston under F.R.C.P. 30(b)(6), at 29:16-30:12)]. The DHSS Director and Office of the Governor are not generally consulted regarding licensing decisions. [Doc. 33-1, p. 17-18 (Dep. of Koebel under F.R.C.P. 30(b)(6), at 59:10-60:25)].

### b.  Surgical Center of Creve Coeur License Revocation Process

The record reflects only one other case in which DHSS attempted to revoke an ASC's license. Prior to the revocation of SCCC's license, SCCC had an opportunity to submit plans of correction. [Doc. 33-4, p. 11 (Dep. of Langston under F.R.C.P. 30(b)(6), at 25:1-3)]. Following the submission of the plans of correction, DHSS sent surveyors back to SCCC to determine the extent to which the facility had righted the issues identified in the deficiency statement. *Id.* at 25:4-12. DHSS concluded that the

17

conditions were such that it was "unlikely, if not impossible, that the facility could come into reasonable compliance in any length of time." *Id.* Prior to revoking the license, DHSS made a substantial effort with SCCC to remedy the deficiencies, involving numerous back and forth communications with SCCC. *Id.* at 28:1-22. After years of back and forth communications, DHSS made the decision to revoke the center's ASC license.

The statement of deficiencies issued to SCCC by DHSS in November 2010 was 47 pages long. [Doc. 33-2, p. 28-74]. The deficiencies identified by DHSS included the failure to:

- Assure the provision of adequate equipment in good repair within the facility to provide efficient services and protection to the patient and staff in violation of 19 C.S.R. 30-30.020(1)(A)14 and (B)1.

- Maintain complete personnel records on each employee in violation of 19 C.S.R. 30-30.020(1)(A)15 and (B)3 and section 660.317, RSMo Supp. 2011.

- Have a Medical Executive Committee and Credentials and Peer Review Committee in violation of 19 C.S.R. 30-30.020(1)(B)1, 6, 12 and 13.

- Maintain complete medical records, including copies of patient's consent for procedures in violation of 19 C.S.R. 30-30.020(1)(B)1 and 7 and (F)3.

- Update or follow an ongoing current quality of care and improvement program to ensure safety and improved patient health outcomes in violation of 19 C.S.R. 30-30.020(1)(B)1 and 12.

- Ensure that nursing personnel were familiar with the location, operation and use of electrocardiogram (EKG or ECG) equipment, pulse oximeter, blood pressure equipment and emergency and resuscitative equipment in violation of 19 C.S.R. 30-30.020(1)(C)7.

18

- Have a policy on mandatory nursing overtime in violation of 19 C.S.R. 30-30.020(1)(C)9.

- Develop policies and procedures in consultation with at least one anesthesiologist and approval by the governing body on the administration of anesthetics and drugs which produce conscious and deep sedation in violation of 19 C.S.R. 30-30.020(1)(E)3.

- Follow procedures relating to procuring, storage, security, records, labeling, preparation, orders, administration, adverse reactions and disposal or other disposition of drugs and specific procedures for controlled drug security and recordkeeping and for allowing nurse staff to provide conscious sedation to patients without conscious sedation training in violation of 19 C.S.R. 30-30.020(1)(B)1 and (H)2.

- Follow acceptable infection control standards of practice by failing to ensure staff followed policy and acceptable standards for hand hygiene and glove use and failed to ensure staff maintained the sterility of supplies used while starting an intravenous catheter in violation of 19 C.S.R. 30-30.020(1)(B)1 and (K)4.

- Provide infection control/prevention training to one of the staff members in the operating room in violation of 19 C.S.R. 30-30.020(1)(B)1 and (K)5.

[Doc. 15-1, p. 4-5 (Letter from Emily Dodge, Assistant Attorney Gen., to Plaintiff's Counsel (Dec. 1, 2015))]. In July 2012 DHSS also noted that SCCC's sole physician was no longer performing surgery at the center. [Doc. 40-1, p. 4 (email from Langston to Linneman (July 31, 2012), Bates 006712)]. Despite these deficiencies and the fact that they "put[] all patients at risk of harm," DHSS continued to discuss suspending SCCC's license, rather than revoking it. [*Id.*; Doc. 40-1, p. 2 (email from Jackson to Langston (Feb. 9, 2011), Bates 005530)].

### c. Treatment of PPKM

In evaluating whether DHSS's actions violated the Equal Protection Clause, the Court has considered not whether DHSS had a rational basis for enforcing the physician

19

privileges requirement for ASC licensure, but whether the *course* of enforcement pursued by DHSS was rational. This is an important distinction, especially in this case where Missouri law sets out a specific process for DHSS to follow when a situation arises in which an ASC like PPKM fails to comply with all rules and regulations.

The Court does not conclude that DHSS could never revoke PPKM's ASC license for failing to comply with the physician privileges requirement. It concludes only that DHSS must follow the same statutory procedure for revoking the license as it follows for every other ASC, as set out in Mo. Rev. Stat. § 197.293. DHSS has presented no evidence that this process was followed in the time prior to or since the institution of the preliminary injunction.[10]

As discussed above, the September 25 letter was the first time DHSS informed PPKM that it planned to revoke its ASC license on December 1. DHSS considers this to be the formal notice of deficiency to PPKM. [Doc. 33-3, p. 11 (Individual Dep. John Langston, at 33:5-8)]. This is the same letter in which DHSS informed PPKM that it had made its decision about how to address the deficiency, and planned to revoke the center's license as soon as the deficiency arose.[11] While there is a form that is generally, though

---

[10] During oral arguments on the permanent injunction, Defendant suggested that as five months have elapsed since PPKM's deficiency arose, it would no longer violate the Equal Protection Clause for DHSS to revoke the license. However, Defendant has presented no evidence that DHSS has done anything to comply with the statutory plan of corrections process over the last five months. As DHSS has continued to ignore its obligation to follow this process, a revocation of the license at this point would still violate the Equal Protection Clause.

[11] Defendant argues that DHSS did not attempt to summarily revoke PPKM's ASC license because it notified PPKM of the impending deficiency in two letters before November 30, and PPKM failed to provide an acceptable plan of correction. However,

not always, used to inform ASCs of deficiencies, the form was not used in this case. *Id.* at 35:9-37:9. The general form invites the recipient to submit a plan of correction and discusses how to submit the plan of correction. After sending the September 25 letter, DHSS had no further formal communication with PPKM until DHSS sent a second letter on November 25, informing PPKM that it had not received notice that PPKM had found a doctor with admitting privileges, and would therefore proceed with revoking the ASC license at the center's close of business on November 30. No draft or plan of correction was ever solicited from PPKM. *Id.* at 36:15-21. Prior to this point, DHSS had never revoked an ASC license without first providing the licensee an opportunity to cure deficiencies through the plan of correction process.[12] [Doc. 33-4, p. 20 (Dep. of Langston under F.R.C.P. 30(b)(6), at 41:18-23)].

---

as the deficiency did not arise until November 30, it is clear that the attempted revocation was an immediate action. DHSS could not have revoked PPKM's license because it lacked a physician with admitting privileges until the admitting privileges were actually lost on the 30th. Moreover, nowhere in the record is there any evidence that DHSS has ever required that an ASC provide a plan of correction prior to the deficiency arising. It is clear that the PPKM received disparate treatment in the way in which it was informed of the deficiency, and the timeframe within which it was expected to correct the deficiency without having its license revoked.

[12] During oral arguments, DHSS suggested that PPKM's independent failure to submit a plan of correction after being notified of the deficiency meant that there was sufficient justification for DHSS to revoke the license under section 197.293. However, there was nothing in DHSS's communications that suggested it was invoking a statutory plan of correction process. Furthermore, PPKM did discuss with DHSS its ongoing attempts to find a new physician with hospital privileges. DHSS contends that the fact that this plan did not have a concrete timeframe for implementation meant that it was insufficient. However, the record indicates that DHSS understood that it could take up to six months for a physician to regain hospital privileges. [Doc. 33-1, p. 3 (Dep. of Koebel under F.R.C.P. 30(b)(6), at 10:1-18)]. This suggests that to the extent that PPKM had an obligation to submit an unsolicited comprehensive plan of correction including a projected timeframe, it did so. Moreover, there is nothing in DHSS's regulations or the

The timing of the notices informing PPKM that its license would be revoked suggests disparate treatment. Generally, the statutory process set out at Mo. Rev. Stat. § 197.293 is set in motion by DHSS's notice of deficiency. [Doc. 33-4, p. 5 (Dep. of Langston under F.R.C.P. 30(b)(6), at 12:9-11)]. Prior to this case, DHSS has never made a decision to revoke an ASC's license due to deficiencies until the ASC has submitted a plan of correction and had time to implement that correction. DHSS admits that when it inspects ASC facilities, it identifies deficiencies at most facilities which are subsequently resolved by plans of correction. [13] [Doc. 15-1, p. 6]. Despite most facilities containing deficiencies, license revocation is extremely rare. Even in the egregious SCCC case the

_____

statutes surrounding enforcement to suggest that an institution's attempts to cure a deficiency are insufficient simply because there is no concrete date presented by which the problem will be solved. In fact, the statute contemplates that some plans of correction will be unsuccessful and necessitate further departmental action. Everything in the record suggests that in SCCC's case the Department was highly doubtful that the center's deficiencies could ever be corrected. Despite this skepticism, DHSS worked with SCCC to attempt to cure the egregious safety deficiencies and gave the center an extended period of time to implement changes. Nothing similar was done for PPKM where the center's single deficiency posed no safety risks.

[13] During oral arguments on the permanent injunction, Defendant argued that PPKM has failed to demonstrate that it was disparately treated because PPKM has only identified SCCC as a similarly situated entity, and the revocation process for SCCC was carried out under a different director. However, the record is clear that nearly all ASCs exhibit deficiencies at some point which require a plan of correction. PPKM is similarly situated to all of these entities to the extent that the plan of correction process applies. The Court focuses its discussion on SCCC because it is the only case in the record in which DHSS attempted to revoke an ASC license. This shows how rare ASC license revocation is. The circumstances surrounding the SCCC revocation also show that the deficiencies resulting in license revocation are generally much more severe than PPKM's deficiency.

22

center was given nearly two years to resolve the deficiencies before DHSS decided to revoke the license.[14]

In stark contrast with DHSS's general procedure of identifying deficiencies, notifying the ASC of the deficiency, undergoing a course of communication with the ASC, and then deciding whether license revocation is appropriate, DHSS in this case decided prior to engaging in any communication with PPKM that the license would be revoked if the deficiency was not corrected by the exact day the deficiency arose. Two elements of this exchange are particularly notable. First, PPKM had no deficiency at the time DHSS sent its September 25 and November 25 notices. This prospective identification of impending deficiencies is unique to PPKM in the record. Second, DHSS made the decision to revoke PPKM's license without soliciting a plan of correction and without permitting PPKM to retain its license during any period of deficiency. Such hasty action is not contemplated by the enforcement statute.[15]

---

[14] In its preliminary injunction order, the Court noted that SCCC was given approximately three months to resolve its deficiencies. The Court adopted the three months duration from Mr. Langston's deposition. [*See* Doc. 33-4, p. 14 (Dep. Of Langston under F.R.C.P. 30(b)(6), at 28:1-22)]. However, the record is clear that SCCC's deficiencies were identified in November 2010, [*See* Doc. 33-2, p. 28-74], and as of July 2012 Mr. Langston was still proposing suspending SCCC's license, [Doc. 40-1, p. 4 (email from Langston to Linneman (July 31, 2012), Bates 006712)]. The Court concludes that Mr. Langston's deposition does not reflect the actual duration of SCCC's deficiencies, and that the deficiencies actually endured for a period of years.

[15] While Mo. Rev. Stat. § 197.220 provides that DHSS may suspend or revoke a license in any case in which it finds that there has been a "substantial failure" to comply with the licensing requirements and does not give any restrictions on DHSS's course of conduct, Mo. Rev. Stat. § 197.293 prescribes an enforcement process. Under the general rule of construction that specific statutes control over general ones, the Court looks to § 197.293 for the process governing DHSS's actions.

23

DHSS admits that PPKM's physician losing her hospital privileges presents no immediate threat to patient health or welfare. [Doc. 33-4, p. 7 (Dep. of Langston under F.R.C.P. 30(b)(6), at 18:11-17)]. PPKM has not been performing abortions since its physician's hospital privileges expired. [Doc. 33-4, p. 6 (Dep. of Langston under F.R.C.P. 30(b)(6), at 17:5-11)]. Any doctor performing such a procedure without the requisite hospital privileges would be subject to criminal prosecution under Mo. Rev. Stat. § 188.080.[16]

Furthermore, the record reflects that the Department's consideration of other ASCs' deficiencies involving much more serious threats to patient health and safety has been undertaken in a much more incremental fashion. SCCC had far more deficiencies than does PPKM, and the deficiencies presented far more obvious risks to the welfare of the patients at the center. The record reflects that SCCC failed to ensure that the drugs used at the center were maintained securely, allowed nurses to provide patients conscious sedation without training, failed to follow acceptable infection control standards, and failed to ensure that its nursing staff was aware of the location of emergency resuscitative equipment. These shortcomings constitute egregious threats to patient welfare. Despite the risks posed by the practices, DHSS made a substantial effort with SCCC to remedy

---

[16] While the Eighth Circuit has acknowledged that Mo. Rev. Stat. § 188.080 furthers important state health objectives, these objectives all revolve around the state's interest in ensuring that the patient will be able to receive prompt and consistent care in the event that there is a complication with the abortion. *Women's Health Center of West County, Inc. v. Webster*, 871 F.2d 1377, 1381 (8th Cir. 1989). None of these health objectives are relevant in this context where no abortions are being performed and the state has no evidence that any abortion will be performed while the deficiency is addressed.

24

the deficiencies and did not decide to revoke the center's ASC license until approximately two years after the deficiencies were identified.

There is no question that SCCC's safety deficiencies made the center less deserving of DHSS leeway in developing and implementing a plan of correction than does PPKM's single deficiency, which DHSS admits presents no immediate threat to patient welfare.[17] Yet, the record reveals that SCCC was given significantly more opportunities to communicate with DHSS and attempt to correct the deficiencies than was PPKM. This type of irrational disparate treatment is prohibited by the Equal Protection Clause. *See Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004).

The record also reflects that PPKM was treated disparately as a result of animus toward PPKM. Unlike is customary at DHSS, the September 25 notice of deficiencies letter was drafted at levels high above Mr. Langston, who has responsibility over ASCs at DHSS and whose staff would normally be in charge of generating notices of deficiencies and overseeing plans of correction submitted by ASCs. [Doc. 33-3, p. 13 (Individual

---

[17] According to DHSS corporate representative Bill Koebel, an ASC's violation of the hospital privileges requirement ranks as "the highest" level of severity of ASC deficiencies. [Doc. 36-1, p. 3 (Dep. of Koebel under F.R.C.P. 30(b)(6), at 13:1-4)]. Based on the remainder of the record, the Court concludes that this statement is inconsistent with DHSS practice and procedure. Most notably, Mr. Koebel's statement appears to contradict the enforcement statute itself, which suggests that the most significant deficiencies are those presenting "an immediate and serious threat to the patients' health and safety." Mo. Rev. Stat. § 197.293(1). Due to the risks posed by such deficiencies the statute allows DHSS to take action to restrict access to services prior to the development and implementation of a plan of correction, rather than following the normal course of implementing the plan of correction while the ASC continues to function at full capacity. While the Court recognizes that in some instances a physician's lack of hospital privileges might pose such a threat, Mr. Langston testified that no such threat existed in this case because no abortions are being performed at PPKM. Therefore, PPKM's deficiency cannot rank at "the highest" level of severity.

Dep. John Langston, at 37:1-9)]. Mr. Langston suggested that DHSS feared retaliation from Senator Schaefer if it did not act in accordance with the senator's goals, as Senator Schaefer both chaired the Senate Interim Committee on Sanctity of Life and sat on the Senate Appropriations Committee. [Doc. 33-3, p. 9-10 (Individual Dep. John Langston, at 29:10-30:19)]. Prior to sending the September 25 letter, DHSS received many communications from Missouri legislators, right to life advocacy groups, and the press regarding PPKM's licensing and the procedures governing the license. [*See* Doc. 33-2, p. 4-27, 75-83]. While these communications underscore the extent to which PPKM is a disfavored institution in Missouri, they provide no rational justification for the disparate treatment afforded the institution in addressing its licensing deficiency.

DHSS contends that PPKM cannot demonstrate an equal protection violation because it is not similarly situated to other ASCs. The Court addressed this argument above and concluded that it is incorrect. The Department's only other argument is that its revocation was based on objectively verifiable criteria which indicated that PPKM no longer complies with the regulatory requirements to function as an ASC which makes the decision sufficient to withstand rational basis review. However, the circumstances surrounding the revocation suggest that the way the revocation was undertaken was "the product solely of animus." *Gallagher v. City of Clayton*, 699 F.3d 1013, 1021 (8th Cir. 2012). While DHSS's decision to revoke the license can be justified based on PPKM's inability to satisfy the requirements of 19 C.S.R. § 30-30.060(1)(C)4 and Mo. Rev. Stat. § 188.080, these violations are, as discussed above, less significant than SCCC's violations,

26

which ran afoul of 19 C.S.R. § 30-30.020(1)(A)14-15, (B)1, 3, 6-7, 12-13, (C)7, 9, (E)3, (F)3, (H)2, (K)4-5, and Mo. Rev. Stat. § 660.317.

That is not to say that DHSS has no rational basis for enforcing 19 C.S.R. § 30-30.060(1)(C)4 and Mo. Rev. Stat. § 188.080. Clearly the Department has a strong interest in enforcing the statutes and regulations promulgated to govern licensing of ASCs. However, there must be a rational basis for the course of enforcement being undertaken by the Department. DHSS may not target individual disfavored institutions by insisting upon rigid regulatory compliance rejected by the statutory enforcement framework and the Department when dealing with more egregious deficiencies. Here DHSS has presented no rational basis to justify its treatment of PPKM.

### D. Interests of the Parties and the Public

As PPKM cannot perform abortions absent a physician with admitting privileges and DHSS has admitted that PPKM's retention of the license does not threaten public health or safety, DHSS's interest in revoking the center's license is minimal. As PPKM would be deprived of its license, a property right, if DHSS is permitted to revoke the license, PPKM's interest in this injunction is greater than is DHSS's.

It is also in the public interest to grant PPKM's requested injunction. If PPKM is able to find a qualified physician before its license expires it will be able to immediately return to providing abortion services without going through the costly and time intensive process of applying for a new license. As PPKM cannot perform abortions without a physician with admitting privileges, the public interest is not hampered by the center being permitted to retain its license through its expiration date.

27

## IV. Conclusion

For the reasons set forth above, PPKM's motion for permanent injunction is granted. DHSS may not revoke PPKM's ASC license prior to its expiration.

/s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated: May 11, 2016
Jefferson City, Missouri